IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Virginia Arellano                          :
730 Spiegel Ct Apt 1H                       :
Marysville, Ohio 43040                      :
                                            :   CASE NO:
AND                                         :
                                            :
Francisco Gonzalez                          :   JUDGE:
730 Spiegel Ct Apt 1H                       :
Marysville, Ohio 43040                      :
                                            :   **CLASS ACTION COMPLAINT WITH**
AND                                         :   **JURY DEMAND ENDORSED HEREIN**
                                            :
Javier Badell                               :
489 Humphrey Ln                             :
Marysville, Ohio 43040                      :
                                            :
AND                                         :
                                            :
Jorge Salgado                               :
220 Pearlash Rd                             :
Marysville, Ohio 43040                      :
                                            :
AND                                         :
                                            :
Victor Rios                                 :
451 Wellsleyglen Dr.                        :
Columbus, Ohio 43207                        :
                                            :
AND                                         :
                                            :
Vanessa Leon                                :
451 Wellsleyglen Dr.                        :
Columbus, Ohio 43207                        :
                                            :
AND                                         :
                                            :
Maria Valentina Cimmarusti                  :
800 Otway Rd Apt 1D                         :
Marysville, Ohio 43040                      :
                                            :
            Plaintiffs,                      :
                                            :

1

v.                                      :
                                        :
Honda Development and Manufacturing of  :
America, LLC                            :
24000 Honda Pkwy                        :
Marysville, Ohio 43040                  :
                                        :
            Defendant.                  :

## **INTRODUCTION**

1.      The Plaintiffs bring this suit for damages caused by unlawful race/ethnicity and national origin discrimination, harassment, and retaliation by Honda of America Mfg., Inc.

2.      In addition to those claims, Plaintiff Javier Badell has an individual disability discrimination claim pursuant to the Americans with Disabilities Act (ADA).

3.      Plaintiffs each worked as production associates for Honda at the East Liberty Ohio Manufacturing plant.

4.      Plaintiffs' tenure at Honda overlapped. All worked at Honda during some period between June 1, 2022, through September 15, 2024.

5.      Each Plaintiff is foreign born and is of Hispanic/Latino ethnicity.

6.      The native language spoken by each Plaintiff is Spanish. Some of the Plaintiffs speak no English. All speak with a Spanish accent.

7.      As of 2022 Honda employed 3100 associates at its East Liberty plant. Of those 3100, approximately 5% (155) were Hispanic.

8.      In its 2022 Inclusion & Diversity Report, Honda proclaims: "Diversity is vital to the success of our company…." And "we need to vigilantly support this direction to foster an inclusive environment embracing people of different backgrounds, gender, race, ethnicity, sexual orientation, and disability, as well as diversity of thought."

9.    Despite this laudable goal of hiring, respecting, and embracing employees of different ethnicities, the reality for Honda's East Liberty Hispanic employees, including Plaintiffs, was exclusion, hostility, and discrimination.

10.    Hispanic employees are set up for failure from the beginning of their tenure because training, including new hire onboarding and safety training, is presented in English with no interpretation for Spanish speakers.

11.    Training materials are written in English with no translation for Spanish speaking and Spanish reading employees.

12.    On-the-job training and daily team meetings are conducted in English only.

13.    Honda's policies, procedures, and signage (throughout the plant) are written in English only.

14.    HR personnel, medical personnel, and safety personnel speak and conduct business in English.

15.    Furthermore, Spanish speakers are forbidden from speaking Spanish on the production line.

16.    Honda's "English only" work environment is hostile toward Hispanic employees. Hispanic employees are denied effective training, are held to account for complying with policies and procedures that they are unable to read or understand and are unable to effectively communicate with leadership and support personnel.

## **PARTIES**

17.    Plaintiff Virginia Arellano is originally from Venezuela but is now an Ohio resident.

18.    Plaintiff Javier Badell is originally from Venezuela but is now an Ohio resident.

19.    Plaintiff Maria Valentina Cimmarusti is originally from Venezuela but is now an Ohio resident.

3

20.     Plaintiff Franciso Gonzalez is originally from Venezuela but is now an Ohio resident.

21.     Plaintiff Vanessa Leon is originally from Cuba but is now an Ohio resident.

22.     Plaintiff Victor Rios is originally from Venezuela but is now an Ohio resident.

23.     Plaintiff Jorge Salgado is originally from Colombia but is now an Ohio resident.

24.     Defendant is a "person," an "individual" and an "employer" within the meaning of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").

25.     Defendants' human resources policies are administered and directed in whole or in part

from this District.

26.     Defendant's respective headquarters, principal places of business and statutory agents are

located in this District.

27.     Some or all of the discriminatory conduct, including the decisions, policies and practices

which give rise to these claims, occurred in this District.

28.     Some or all of the injuries suffered by Plaintiffs and the Plaintiff Class occurred in this

District.

## **JURISDICTION AND VENUE**

29.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 and 1343 because Plaintiff alleges

claims which arise under federal law and which are brought to recover damages for the deprivation

of equal rights.

30.     Jurisdiction is also proper because the Plaintiffs have exhausted their administrative

remedies, have complied with all statutory prerequisites, have been issued "right to sue" letters

from the Equal Employment Opportunities Commission and have timely filed this Complaint.[1]

31.     Venue is proper pursuant to 28 U.S.C. §1391(b)-(c) because Defendants' misconduct that

---

[1] The parties executed a Tolling Agreement extending the Notice of Rights deadline to April 15, 2025.

gives rise to the Complaint occurred, in substantial part, in this district, because the Defendants can be found in this district and employment records relevant to Plaintiff's claims can be found in this district.

32.     Personal jurisdiction is proper over Defendant because Defendant is a resident of this judicial district and committed unlawful acts in this district which give rise to this complaint.

## FACTS COMMON TO ALL PLAINTIFFS

33.     Plaintiffs incorporate into this paragraph the allegations from each of the preceding paragraphs as if fully rewritten herein.

34.     During all times relevant herein Honda had a goal of diversifying its East Liberty workforce to include more individuals of Hispanic/Latino descent.

35.     During all times relevant herein Honda recruited Hispanic/Latino candidates, including some of the named plaintiffs, who moved from Florida to come and work for Defendant in Ohio.

36.      Honda knew or should have known that many of the Hispanic/Latino candidates being recruited and hired did not speak English fluently or did not speak any English at all.

37.     At the East Liberty plant, Honda conducts business in English.

38.     Honda maintains written personnel policies and procedures, including, but not limited to: policies governing attendance, paid time off, work-related injuries, leaves policies, non-discrimination, compensation, promotion, transfer, code of conduct, health and safety procedures, and more (hereinafter "policies and procedures").

39.     Honda's personnel policies and procedures are written in English. Attached hereto as exhibits are some of the policies Honda produced to the EEOC in response to Plaintiffs' EEOC charges. **(Exhibit A)**

40.     Upon information and belief, Honda's policies forbid the use of cell phones in the

production facility and during training.

41.     Thus, the use of common translating application (like Google Translate) was not available to individual employees.

42.     At all times relevant herein, Honda did not provide personnel policies and procedures in Spanish nor was an interpreter readily available to assist Spanish speakers.

43.      New employees at Honda, including the named Plaintiffs and members of the proposed class, undergo new-hire onboarding and training, including completing paperwork, touring the facility, viewing videos, safety training, and more.

44.     New-hire onboarding is conducted in English.

45.     Spanish speaking new-hires must rely on bi-lingual co-workers (if any happen to be present) to interpret/translate important concepts like safety procedures, completion of tax forms, benefits information, and more.

46.     Spanish speaking new-hires do not have the opportunity to ask questions to ensure their understanding of important concepts unless a bi-lingual co-worker is available.

47.     When video is used during new-hire orientation, no Spanish subtitles are provided.

48.     Although OSHA requires that safety training be provided in a language that an employee understands, Defendant does not provide safety training in Spanish.

49.     Once a new production associate is assigned to a specific department, training is accomplished through on-the-job training. In other words, a more experienced associate or Leader trains the new associate as the job is accomplished on the production line.

50.     Spanish speaking employees may or may not have access to bi-lingual co-workers to assist them with this training.

51.     Defendants use department meetings/huddles to convey important information to

production associates, including quality information, production changes, job assignments, and safety information/updates.

52.     Department meetings are conducted in English. Spanish speaking employees may or may not have access to a bi-lingual associate to assist with translation/interpretation during the meeting.

53.     At Honda, associates who suffer work-related injuries are required to consult with Honda's in-house medical personnel to report the injury, receive and/or coordinate treatment, coordinate compliance with work restrictions. Honda's medical personnel conduct business in English.

54.     Spanish speaking associates may or may not have access to a bi-lingual co-worker to interpret and translate.

55.     During *some* of the time relevant to this Complaint, one person working in Honda's East Liberty HR department was bilingual. This person worked on the first shift only and was not always present or available to translate/communicate with Spanish speaking employees.

56.     Except for this one person, no other HR personnel conducted business in Spanish.

57.     Thus, Spanish speakers were cut-off from important resources and/or access to resources was limited by their inability to speak/read English.

58.     Honda employs a third-party contractor, Sedgwick, to administer leave benefits, including FMLA.

59.     Sedgwick conducts business in English making it unreasonably difficult for Spanish speaking employees to avail themselves of Sedgwick's services and/or delaying their access to important services.

60.     Signage throughout Honda's East Liberty production facility is in English, including warning and caution signs, directional, and location signs.

61.     Machine operation and control instructions are in English.

7

62. Computer programs used during the production process are in English.

63. The language barrier between English speaking associates and Spanish speaking associates causes frustration and anger among and between associates.

64. English only speakers cannot convey important and immediate information to Spanish only speakers.

65. Spanish only speakers cannot convey important and immediate information to English only speakers.

66. Spanish speaking associates are told they cannot speak Spanish on the production floor.

67. Spanish speakers are regarded by some co-workers and Leaders as less educated and less intelligent.

68. Spanish speakers do not receive the same quality and level of training as English speakers.

69. Spanish speakers are unable to contribute ideas and information in the same way English speakers do, if at all.

70. Spanish speakers are held responsible for following rules and procedures which they have not read or do not understand because the rules and procedures are written in English only.

71. Upon information and belief, the rate of turnover for Spanish speaking employees is higher than the average rate of turnover for English speaking employees.

## DEFENDANT DISCRIMINATED AGAINST THE NAMED PLAINTIFFS

72. Plaintiffs incorporate into this paragraph the allegations from each of the preceding paragraphs as if fully rewritten herein.

### Virginia Arellano

73. Plaintiff Virginia Arellano was hired October 24, 2023.

74. Arellano was recruited by Defendant and relocated from Florida to work for Honda.

8

75. Spanish is Arellano's native language, although she does speak some English with a Spanish accent.

76. Arellano was assigned to the production line on second shift.

77. From the beginning of her tenure, she had difficulty communicating with trainers, with her superiors, with Human Resource personnel, and other support personnel, but also with her English-speaking, American, co-workers.

78. Because she speaks some English, Arellano tried to interpret for some of her Spanish speaking/reading co-workers, including her husband.

79. For example, during new hire orientation, the training was conducted in English and there were no bi-lingual trainers.

80. While being trained herself, Arellano would, to the best of her ability, repeat the trainer's words in Spanish and translate written materials from English to Spanish but many words and important concepts were lost in translation because Arellano is not a trained translator/interpreter and was trying to pay attention for her own benefit.

81. This occurred in other training as well.

82. Arellano would also attempt to interpret for Spanish speakers when speaking to Team Leaders, Production Managers, and support personnel, but there were many impediments to this process including the fact that Arellano was not entirely fluent in English and had her own duties to complete.

83. On the production line and in her department, Arellano and her Spanish speaking co-workers were told that we are not allowed to speak Spanish and must only speak English.

84. Arellano was told this by one of her coworkers and by a supervisor on the line.

85.     The effect of this rule is that Hispanic employees, unlike their non-Hispanic/English-speaking co-workers, were not allowed to speak while working on the production line.

86.     Arellano heard American/English speakers make negative comments about Hispanic employees, including comments like "Latins suck."

87.     Arellano, who had never worked in production, did not receive the same thorough on-the-job training as newly hired, American born, English speaking employees.

88.     American/English speaking employees and leaders had difficulty explaining concepts in a way Spanish speakers, including Arellano, could understand. They would often become frustrated and give up.

89.      As a result of the OJT training deficit, she and other Spanish speakers were more susceptible to injury and were often assigned more rudimentary and more difficult jobs to perform.

90.     Arellano found her questions and requests for help were often ignored or disregarded.

91.     In December 2022, she was working in her department and began experiencing a lot of physical difficulty completing her work. She suffered severe pain in her back, arms, neck, and hands, and the strenuous activity even affected her hemorrhoids.

92.     She tried to explain her problem to her Team Leader who laughed at her and mocked her.

93.     She later went to the medical department. They provided ice and administered oral painkillers. Although she was still in pain, she was ordered to return to her line.

94.     She decided to seek care outside of Honda.

95.     Arellano was instructed by a physician to take time off work to reduce inflammation.

96.     When she delivered the medical documentation to Human Resources, she was treated disrespectfully, as though she was lying about her injury.

97.     When Arellano informed Honda of her doctor's orders, she was "informed" that her time off work was caused by a non-work-related condition.

98.     The English-speaking HR representative spoke to her in a condescending tone as though she was uneducated and ignorant and did not try to explain Honda's processes related to a work-related injury.

99.     Arellano has a university degree.

100.    HR personnel told her if she wanted to "rest" it was her responsibility, and Honda would not pay for it.

101.    She again attempted to explain that she was injured at work.

102.    Personnel in the medical department instructed her that she had to continue working, but she disagreed and remained off work.

103.    On January 4, 2023, she returned to work and was informed by Human Resources that they were going to give her a warning for missing work due to her injury.

104.    Arellano was subjected to daily acts of discrimination/harassment by Defendant's leadership, including being ignored, being disrespected, being told she could not speak Spanish, being subjected to insults about her race/ethnicity/national origin, language, and accent.

105.    Another example began on January 23, 2023, Arellano received a paycheck for 2 weeks of work (80 hours). The gross amount of the paycheck was only $54.47 plus some deductions for payment of insurance and taxes.

106.    She went to Human Resources to inquire about the incorrect paycheck.

107.    HR told her she must wait and refused to answer any of her questions.

108.    The next day she asked again, and again, an HR Representative told her to wait.

109.    On the third day she went back to HR about her short pay.

110.    The HR Representative became angry and told her to keep waiting and that there were other workers in the same situation. They offered no further explanation.

111.    English speaking/American born employees were also complaining about pay errors but were receiving detailed explanations.

112.    Arellano was treated like she was too stupid to understand.

113.    Arellano complained about the discriminatory treatment and was told that if she did not like it, she should quit.

114.    Arellano asked to speak with the head of HR but the HR Representative scoffed.

115.    Arellano returned to her line crying because she had financial commitments and had no money. She could not even afford gas for her car.

116.    In March 2023 Arellano's physician placed her off work for non-work-related conditions.

117.    She was directed by the medical department to contact Honda's third-party administrator, Sedgwick, to apply for medical leave.

118.    Sedgwick conducts business in English and the forms used to apply for leave are in English.

119.    Arellano was treated with derision and disrespect because of her race/ethnicity/national origin, her native language, her accent and her need for translation assistance.

120.    After trying to understand the short-term disability process and receiving no assistance, she gave up and did not return to work for Honda.

### Javier Badell

121.    Plaintiff Javier Badell was hired by Honda on November 14, 2022, to work on the assembly line at the East Liberty plant, assigned to B Shift. (5 p.m. – 1:30 a.m.)

122.    Badell speaks very little English.

123.    From the beginning of his employment, Badell had difficulty communicating with his superiors, with HR, and with other support personnel, but also with his English-speaking, American, co-workers.

124.    American/English speaking employees and leaders had difficulty explaining concepts in a way Spanish speakers, including Badell, could understand. Leaders would often become frustrated by the language barrier and give up.

125.    Badell is disabled as that term is defined by the ADA.

126.    After the first two weeks of his training, Badell was assigned to the morning shift (A Shift) because Honda needed additional personnel on that shift.

127.    On January 16, 2023, Badell was returned to B shift.

128.    On more than one occasion, Badell's Team Leader and his co-workers on the line told him not to speak Spanish on the line.

129.    Badell and his co-workers were frequently mandated to work overtime.

130.    Because of the frequent overtime, Badell's sleep routine was disrupted which is extremely risky due to his disability and the onset of seizures.

131.    On February 14, 2023, Badell suffered a seizure during his day off work.

132.    On February 15, 2023, Badell, with the assistance of an English-speaking co-worker, went to HR to ask to be permanently moved to A shift due to his medical condition.

133.    He was instructed to obtain medical documentation in support of his request.

134.    On February 21, 2023, Badell's physician wrote the recommendation that he be transferred to A shift immediately due to his condition and symptoms.

135.    Badell provided the documentation to Honda's Disability Manager.

13

136.    Badell was given no explanation about the ADA accommodation process but was told by HR that they would see what they could do.

137.    Badell did not know that there was an ADA policy, nor could he have read or understood the policy because it was written in English.

138.    Badell returned to HR repeatedly seeking a response to his request.

139.    In his interactions with HR, Badell was expected to speak and understand English if no one was available to translate for him.

140.    He was told on several occasions, "if you don't speak English fluently you shouldn't be here."

141.    Badell was treated by HR Representatives as though he was too stupid to understand.

142.    At one point he requested to speak with a higher-ranking HR representative, but his request was denied.

143.    Badell worked every day from February 21, 2023 through February 27, 2023. On several of those days, he was forced to visit the medical department because he was experiencing auras, a precursor to seizures.

144.    On February 27, 2023, Badell was finally informed that his request for accommodation was denied because transfers to first shift were conducted according to seniority and his health concerns were not relevant.

145.    The HR representative suggested that to switch to first shift, he would need to resign from Honda, then apply with Adecco and work for Honda as a temp on A Shift.

146.    Badell was presented with a card with contact information for Sedgwick but was given no information about what they do or how the process works.

147.    His physician took Badell off work after February 27, 2023.

148. Thereafter, Badell followed call off procedures as he understood them.

149. With assistance, he contacted Sedgwick and opened a case requesting unpaid leave.

150. Badell attempted to communicate with Sedgwick in Spanish, but the Sedgwick representatives could not explain their process in Spanish.

151. Neither Honda nor Sedgwick suggested any alternative accommodation for his disability other than leave of absence.

152. Badell received STD benefits through April 11, 2023.

153. On April 11, 2023, Badell contacted Honda and filed a discrimination complaint.

154. Realizing that Honda was a discriminatory environment and that his disability would not be accommodated, Badell resigned his position on April 11, 2023.

### Maria Valentina Cimmarusti

155. Cimmarusti was hired at the East Liberty plant on October 24, 2022.

156. Cimmarusti was assigned to the production line in the TAF 3 department on B shift.

157. Cimmarusti speaks only a few words of English.

158. She is unable to read or understand English.

159. From the beginning of her tenure, she had difficulty communicating with trainers, with her superiors, with Human Resource personnel, and other support personnel, but also with her English-speaking, American, co-workers.

160. Bi-lingual co-workers (including her husband) would sometimes assist Cimmarusti when communicating with English speakers, but her-bi-lingual friends had difficulty helping Cimmarusti because they were not trained to interpret, especially when it came to technical terms and concepts and legal terms and concepts.

161. American/English speaking employees and leaders had difficulty explaining concepts in a way Spanish speakers, including her, could understand. They often became frustrated and gave up trying to explain.

162. As a result of the training deficit, she and other Spanish speakers, were more susceptible to injury, were assigned more rudimentary and more difficult jobs.

163. On or about December 15, 2022, Cimmarusti was disciplined for missing three days of work due to illness even though she had a doctor's excuse.

164. She was informed that Honda's policy requires an employee to be off work for four days for it to be counted as a single absence.

165. Cimmarusti was not aware of this policy but could not have read it or understood it even if she had been aware of it.

166. She was also unaware of and could not read or understand the progressive discipline policy or the attendance policy.

167. With the assistance of her bi-lingual co-worker, Cimmarusti complained to the Production Manager that the reprimand was unfair.

168. While employed by Honda, Cimmarusti suffered two work-related injuries.

169. Her first injury occurred on February 7, 2023.

170. Cimmarusti had no knowledge of Honda's safety policies nor the procedures for reporting a work-related injury.

171. Those policies are in English only.

172. On February 8, a bi-lingual co-worker tried to help her speak to her Team Lead about her injury.

173. The Team Leader ignored them.

16

174. Later that same evening, she was inexplicably reassigned to perform quality control duties on finished cars parked on the Honda lot.

175. It was 35 degrees outside and it was raining.

176. She was not dressed properly to work outside in the weather.

177. Her PM gave her a jacket out of the lost and found.

178. Cimmarusti spent the next two hours working outside in the freezing rain with her leg injured and hurting.

179. After her shift, Cimmarusti waited for her husband in the lunchroom.

180. He was also employed at Honda in a different department.

181. While she waited, she began to cry in frustration and pain. Another employee saw her there wet and crying. He reported what he saw to a Manager.

182. On February 9, 2023, Cimmarusti's PM finally took her to the medical department to address her leg injury.

183. On February 21, 2023, Cimmarusti injured her back while performing a new process. The process required her to lift and move a large, heavy door panel in a short period of time.

184. She tried to explain to her Team Leader that performing the job was causing her pain.

185. She asked to be re-assigned.

186. He told her that he could not have a person in his area who did not do "RED JOBs".

187. She tried to demonstrate that the panel was too heavy for her to lift, and the placement was too high and was beyond her reach.

188. The Team Lead told her that to avoid performing the job, she would need work restrictions.

189. The Team Lead ordered her to remain on the job until someone could come and explain how to do the job better. The person never arrived

17

190.    As the night wore on, Cimmarusti continued to work.

191.    She suffered a back injury as a result

192.    On February 22nd, Cimmarusti's husband accompanied her to her PM's office.

193.    Cimmarusti's husband speaks and understands English more fluently.

194.    Cimmarusti's husband explained that she was in pain and was feeling that she needed to go to the medical department.

195.    Cimmarusti's PM tried to convince her husband that she was not really injured but finally told her husband that he was going to take Cimmarusti to the medical department.

196.    He never did.

197.    Cimmarusti's husband worked in a different department.

198.    Instead, he assigned Cimmarusti to perform quality checks for the entire shift.

199.    By the end of the night, she was in extreme pain.

200.    On February 23rd Cimmarusti's physician treated her injury. He prescribed treatment, rest, and physical therapy then placed her off work for one month.

201.    On March 1, 2023, she returned to Honda and went directly to the medical department to deliver her work restrictions.

202.    The Manager of the Medical Department asked why she had not come to her when she began to feel pain.

203.    Cimmarusti attempted to explain the preceding series of events to no avail.

204.    Not receiving prompt medical attention likely exacerbated Cimmarusti's injury.

205.    Cimmarusti was denied prompt medical attention because of her race/ethnicity/national origin and language barrier.

206. On several occasions, Cimmarusti observed American, English-speaking employees leave the line to go to the medical department without any push back from management.

207. Unlike her American born/English speaking co-workers, she was subjected to daily acts of discrimination/harassment, including being ignored, being disrespected, being subjected to insults about her race/ethnicity/national origin, her language and accent.

208. Cimmarusti felt she had no choice but to resign from her position with Honda on or about May 31, 2023.

### Francisco Gonzalez

209. Francisco Gonzalez was recruited by Defendant while living in Florida.

210. He was hired October 24, 2022, and moved to Ohio to work for Honda.

211. Gonzalez speaks Spanish, with only a few words of English.

212. In Florida, he lived and worked among Spanish speakers.

213. In Venezuela, he was an Engineer.

214. One of the primary reasons he came to work for Defendant was that he was offered the opportunity for career advancement.

215. Gonzalez was assigned to work on the assembly line.

216. From the first day of his employment, he had great difficulty communicating with American/English-speaking superiors and co-workers.

217. During training, he could not understand instructions and precautions, and could not ask questions. He had to learn by watching others perform a task.

218. Policies and procedures were not provided in Spanish, but he was expected to know, understand, and follow those procedures.

219.    As a result of the training deficit, Gonzalez and other Spanish speakers, were more susceptible to injury, and were assigned more rudimentary and more difficult jobs.

220.    Gonzalez was told he could not speak Spanish on the line or in the offices.

221.    On December 20, 2022, he was injured while working on the WT-08 line.

222.    He reported the injury to the medical department.

223.    After a while the pain decreased, but personnel in the medical department told him that he had to leave the plant because he could not return to his line and should go to the hospital because without medical clearance, he could not return to his job.

224.    The next day, December 21, 2022, he went to Urgent Care. The doctor prescribed medication and ordered four days of rest away from work.

225.    Gonzalez took that doctor's note back to the plant and presented it to Human Resources.

226.    There they informed him this was not the way things are done, so he had to be seen by a doctor from the plant.

227.    Gonzalez presented at the medical department, with the assistance of a bilingual co-worker.

228.    The nurse told Gonzlez that he had to return to work the same day and that if he had an absence, he needed to cover it with his PTO.

229.    Gonzalez argued that he would follow his doctor's instructions.

230.    The nurse became upset with him and left him alone. After about 30 minutes another person came in and Gonzalez complained about the discriminatory treatment he was subjected to by the nurse. He was told he could go back to HR.

231.    In HR, the Representative in charge treated Gonzalez as though he was stupid, saying it was not his decision. That he should do what he was told and return to his job that day.

232. The Representative was condescending and spoke to him in a discriminatory tone and manner.

233. Gonzalez was forced to report back to the assembly line.

234. He explained the situation to the department staff and they made the decision that he should see the doctor.

235. This was the last day of work, before the winter shut down.

236. After the shut-down, the plant doctor gave Gonzalez an appointment and gave him work restrictions. He was placed in a different job meant to comply with the restrictions.

237. He returned to the Human Resources Department with his wife (Plaintiff Arrellano) because she speaks better English than he does.

238. They intended to levy a complaint about how Gonzlez was being treated and discriminated against.

239. They asked to speak to the head of the department.

240. As the days passed and they did not receive an answer, they returned to the Human Resources department, where they saw the head of the Department and told him that they wanted to discuss a very delicate matter with him.

241. He said, "I'll let you know," but did not meet with them.

242. Gonzalez and Arrellano returned to HR five more times, and were never able to meet with the head of HR.

243. This is not how American/English speaking employees were treated in HR.

244. The concerns and suggestions of Latino/Hispanic employees are not taken seriously.

245. Gonzalez felt cheated, deceived, and discriminated against because none of what Honda promised when it was recruiting him came true.

246.   Unlike his American born/English speaking co-workers, Gonzalez was treated as though he was stupid, was disrespected, and harassed because of his national origin/race and inability to speak English without an interpreter.

247.   He was terminated on March 24, 203 for job abandonment.

## Vanessa Leon

248.   Leon was hired on June 27, 2022.

249.   Leon's native language is Spanish, she speaks very little English.

250.   In Leon's experience at Honda, Latin/Hispanic employees, especially those like her who speak primarily Spanish, are harassed and discriminated against.

251.   Training, including on-boarding and safety training, is conducted in English

252.   Leon, and others, were told they could not speak Spanish on the production line or in the offices.

253.   The effect of this policy is that Spanish speaking employees are unable to speak while working.

254.   Honda did not provide Leon with policies or procedures in Spanish but expected her to know and follow those policies and procedures.

255.   She did not receive the same quality of on-the-job training as her American/English speaking co-workers.

256.   American/English speaking employees and leaders had difficulty explaining concepts in a way Spanish speakers, including her, could understand. Leaders often became frustrated with the language barrier and gave up trying.

257.    As a result, she and other Latinos were given more difficult work to perform but given less assistance from leadership. The sub-optimal training made her and other Spanish speakers more susceptible to injury.

258.    On February 21, 2023, management took Leon off her line because her boyfriend Victor Rios was accused of something.

259.    As usual, she found her questions and concerns were ignored.

260.    She was not accused of doing anything wrong, but management told her to leave.

261.    An armed security person accompanied them to their car and took photos of their license plate as they left the facility.

262.    Leon was given no explanation and was very frightened by what was happening.

263.    The following week, while she was waiting for Rios in the Honda cafeteria, Leon noticed that the employee who had problems with Rios was staring at her.

264.    That night when Leon left for home, she and Rios noticed a car following them and when they arrived home, they were afraid to park. They drove around several times before entering the house.

**265.**    Leon was terrified and was afraid the man would approach her at work.

266.    On March 14, 2023, Leon fell at work.

267.    As the shift progressed, her knee began hurting so much it was very difficult for her to perform her duties. Her Team Leader sent her to the Medical Department.

268.    After icing the knee, she attempted to return to the line, but it was still hurting.

269.    The Team Leader did not care to hear her issues. She was ordered to do Quality control.

270.    She was threatened that if she went home it would count as an attendance occurrence.

271.    The next day Leon went to the emergency room at the Memorial hospital.

23

272.    After remaining off work for 3 days, she returned to work and was assigned back to perform the duties that aggravated her knee.

273.    Leon objected and was told that the only way she could be relieved from performing those duties was with medical restrictions.

274.    Leon's safety concerns were ignored. She tried to continue working.

275.    In her experience, English speaking/American employees receive more respect and concern from leadership.

276.    Latin/Hispanic employees are treated as disposable.

277.    Leon was terminated on April 28, 2023, for job abandonment.

**<u>Victor Rios</u>**

278.    Rios was hired on June 28, 2023 to work in production.

279.    Spanish is his native language although he speaks some English. He speaks with a strong Spanish accent.

280.    Like his co-Plaintiffs, Rios underwent training, including on-boarding and safety training that was conducted entirely in English.

281.    From the beginning of his tenure, he had difficulty communicating with trainers, with his superiors, with HR personnel and other support personnel, but also with her English-speaking, American, co-workers.

282.    American/English speaking employees and leaders had difficulty explaining concepts in a way Spanish speakers, including him, could understand. They would often become frustrated and give up.

283.    On August 8, 2023, Rios was working in the final body/weld department where he was assigned on the first day of work.

24

284.    Around 10-11pm he was doing a process and talking to a friend on the line, when his manager called him in to his office. He said, "you can't speak Spanish on the line."

285.    Rias asked why and his manager explained, "because I don't want you to do it."

286.    Rios explained, "I speak Spanish with people who speak Spanish." His manager reiterated, "we don't want to hear you speaking Spanish."

287.    Rios decided to go to the HR department about the issue. He told them about the whole event, and they told him, "we are going to resolve it, get back on the line immediately."

288.    Time passed and nothing was ever resolved.

289.    However, after going to HR, Rios noticed a discriminatory change in the work environment on the line.

290.    He was forced to change to a different line. When he objected, management said "if you don't want to change, look for another job."

291.    Rios wanted to quit at that time because of the discrimination, but Honda had paid for his relocation from Florida, and he believed he was required to fulfill a 2-year commitment.

292.    On November 2, 2022, he was working on the line when he was approached by management, told to pick up all his belongings and go to HR.

293.    He was placed in an interrogation-type room and left alone.

294.    After 10 minutes, a clearly armed security officer arrived who told him that he could not leave that room.

295.    At that moment, Rios felt helpless and terrified, and after about 30 minutes, an HR representative arrived and told him that another employee had accused him of having kissed her without consent.

296.    Rios adamantly denied the allegation and asked for more information. The only thing they told him was that he had to leave the plant and could not even return to the parking lot.

297.    His girlfriend Vanessa Leon was also required to leave because she was his ride to work.

298.    The armed security person escorted them to the exit and told them not to return until they called.

299.    One week later, a Honda representative contacted him, asking to have a meeting.

300.    She took his statement and told him to report back to work on November 9, 2022.

301.    As it turned out, he was falsely accused as a result of mistaken identity. Apparently, the perpetrator was a different Latino.

302.    Upon his return to work, Rios was switched to a different line without explanation.

303.    He contacted HR and they told him he had no choice.

304.    On February 21, 2023, Rios was performing R\S door install bolt tightening, when a screw got stuck. He proceeded to stop the line.

305.    Almost immediately, he felt a strong blow to the head. When he stood up, he realized he had been hit by another associate. The associate said, "get away from my fucking place motherfucker."

306.    Rios retorted, "you just hit me very hard on the head." His co-worker did not apologize but said, "I'm doing my job get out of my face motherfucker."

307.    Rios was humiliated and embarrassed.

308.    This same co-worker had exhibited hostility toward Rios before. A week earlier, the co-worker had yelled at Rios about marking quality defects on the cars.

309.    He called Rios a "motherfucker" and told him not to mark the defects on the car. Rios tried to explain that he was instructed to perform this job by his Team Leader.

310.    He left saying, "these fucking Latinos want to do whatever they want."

311.    Rios asked him to repeat what he said. The co-worker retorted, "what you heard" and "go back to your country motherfucker."

312.    Rios reported the incident to the team leader, but nothing happened.

313.    After being hit on the head, Rios went to the medical department and told them what happened.

314.    He later reported the matter to a manager and explained that he was afraid for his physical safety and the safety of his family.

315.    After more than an hour, HR sent Rios home.  He was suspended.

316.    Rios felt humiliated, discriminated against, and harassed because he had done nothing wrong.

317.    After 4 days the doctor from Honda called him asking me how he was feeling.

318.    Rios informed him that he had been suspended.

319.    He then received a call from HR asking him to return to work.

320.    When he returned, they put him back on the same line next to the employee who hit him.

321.    The employee stared at him with an intimidating look.

322.    Rios went to HR to request a change of line while the investigation was in process. HR refused.

323.    Thereafter, when leaving the plant, Rios felt that a dark car was following him, he recognized the person as the co-worker who hit him.

324.    Rios was again very concerned for his safety and the safety of his girlfriend, Plaintiff Leon.

325.    Rios is aware of other Latin/Hispanic employees who have been subjected to discriminatory harassment by co-workers and managers.

27

326. Latin/Hispanic employees are treated as though they are always in the wrong and do not receive the same respect and deference as American/English speaking employees.

327. Rios began a period of leave on or about March 2, 2023.

328. He attempted to apply for leave through Sedgwick but was denied.

329. He was terminated effective April 21, 2023.

## **Jorge Salgado**

330. Plaintiffs incorporate into this paragraph the allegations from each of the preceding paragraphs as if fully rewritten herein.

331. Salgado was hired to work at the East Liberty facility on 11/28/2022.

332. Like his co-plaintiffs, Salgado speaks and reads in Spanish.

333. From the beginning of his tenure, he had difficulty communicating with trainers, with his superiors, with HR personnel, and other support personnel, but also with his English-speaking American co-workers.

334. During training, including on-boarding training, he often could not understand important concepts.

335. Salgado did not receive the same thorough on-the-job training as newly hired, American born, English speaking employees.

336. American/English speaking employees and leaders had difficulty explaining concepts in a way he could understand. They would often become frustrated and give up.

337. On or about February 28, 2023, Salgado was sent to work in area WT02 with Team Leader Austin.

338.     Austin showed Salgado a new process he had not previously been trained to perform. Austin did not speak Spanish and Salgado could not understand what he was saying. When Salgado didn't get the process right, Austin got angry.

339.     Austin cussed and started throwing the tools he had in his hands. Salgado was forced to dodge out of the way to avoid being hit. He then picked up the tools from the floor.

340.     Austin angrily ordered Salgado to return to his original work area.

341.     While in his area, working on a process inside a vehicle, Salgado observed Team Leader Austin approach his team leader Samantha, who was doing a repair on the same vehicle.

342.     Salgado heard Austin complain to Samantha that he thought she was going to help him. She replied that she had helped him, and he contemptuously replied "Yes, but don't send me Latin trash again."

343.     Salgado was demoralized and discriminated against.

344.     Honda was aware of the language barrier when Salgado was hired, but did not provide adequate translation/interpretation to ensure that he was trained properly.

345.     On March 1, 2023, he went to the Human Resources department to make a written complaint.

346.     On March 8, 2023, he spoke to Human Resources again, asking for a copy of the report that he had made. HR refused to provide it and also had no response to the complaint.

347.     On March 14, 2023, Salgado was injured when he fell at work. After work, his knee was swollen, and he began to experience intense pain.

348.     He reported the injury on March 15, 2023 to his Team Leader Samantha when he arrived at the plant for his shift

349.    She sent Salgado to the medical department and they put ice on his knee and gave him ibuprofen. He returned to his department and continued to work, but when the pain became too intense, he approached Samantha again and told her he wanted to get medical attention.

350.    Samantha replied with a tone of sarcasm, "Jorge has to go to the doctor again."

351.    Salgado felt humiliated. He never observed Samantha mocking or humiliating his American/English speaking co-workers.

352.    Salgado recalls being told that he was not "allowed" to speak Spanish on the line or in the offices.

353.    Policies and procedures were in English, with no Spanish translation provided so that he could read, understand and follow the policies.

354.    He and other Hispanic/Latino employees are not given the same level of training as are American/English speaking employees.

355.    Salgado, like many of his co-plaintiffs, moved from Florida to work at Honda.

## CLASS ALLEGATIONS

356.    Plaintiffs incorporate into this paragraph the allegations from each of the preceding paragraphs as if fully rewritten herein

357.    Plaintiff Class members have also suffered the same or similar injuries as the named Plaintiffs.

358.    Because of Honda's discriminatory "English only" policy/practice, Plaintiff Class members suffered injuries in the terms and conditions of their employment including, inadequate and/or incomplete training, the denial of compensation and benefits to which they were otherwise entitled, being subjected to unfair or unwarranted discipline, being exposed to safety risks, and being subject to harassment and retaliation from management and co-workers.

359.     Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the Class consisting of:

> All foreign-born Latino/Hispanic persons who work/worked for Honda at the East Liberty facility beginning on or after January 1, 2020 who are not Caucasian and who speak and read Spanish as their native language.

360.     Excluded from the Class are any Class members who timely elect to be excluded from the Class.

361.     Named Plaintiffs are members of the Class and allege that Class members sustained injury in fact as a proximate result of the unlawful conduct alleged herein, specifically including without limitation, lost wages, lost compensation, lost benefits, lost promotions, lost transfers, employment termination and other economic and non-economic damages.

362.     Membership in the Class is so numerous as to make it impractical to bring all Class members before the Court. The exact number of Class members is unknown, but Plaintiffs reasonably estimate and believe two thousand persons in the Class.

363.     Honda has acted on grounds generally applicable to the Class thereby making injunctive relief appropriate.

364.     There are questions of law and fact common to the Class which predominate over any questions which may affect only individual members of the Class, including but not limited to the following:

    a.     Whether Honda's employment policies, patterns and practices discriminated on the basis of race/ethnicity/national origin;

    b.     Whether Honda's employment policies, patterns and practices had a disparate impact based on race/ethnicity/national origin;

    c.     Whether Honda knowingly and intentionally implemented and/or maintained employment policies which they knew discriminated against Hispanic/Latino employees;

31

    d.   Whether Honda engaged in wanton, willful, and/or intentional misconduct; and

    e.   Whether Honda's conduct has satisfied the criteria for the imposition of punitive damages.

365.    Named Plaintiffs are members of the Class they seek to represent. Their claims are typical of the Class members' claims. Plaintiffs will fairly and adequately protect the interests of the Class in that Their claims are typical and representative of the Class.

366.    There are no unique defenses which may be asserted against the Plaintiffs individually, as distinguished from the Class. The claims of Plaintiffs are the same as those of the Class.

367.    There exist no conflicts of interest between Plaintiffs and the other Class members.

368.    The named Plaintiffs have retained counsel that are competent and experienced in complex class action litigation. Plaintiffs and counsel will fairly and adequately represent and protect the interests of the Class.

369.    Plaintiffs' counsel has the necessary financial resources to adequately and vigorously litigate this class action.

370.    Plaintiffs are aware of their fiduciary responsibility to the Class and agrees to diligently discharge those duties.

371.    The questions of law and/or fact common to the members of the Class predominate over questions that may affect only individual members.

372.    The common nucleus of operative facts herein centers on the conduct of Progressive.

373.    This class action is superior to any other method for the fair and efficient adjudication of this dispute.

374.    There will be no extraordinary difficulty in the management of this Class action.

375.     All Class members have been damaged in the same fashion, by the same conduct.

376.     The degree of damages suffered by individual Class members is calculable according to an ascertainable formula.

377.     This action is properly maintainable under both Fed. R. Civ. Proc. Rule 23(b)(2) and (3) because Honda has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declarative relief with respect to the Class as a whole; and because questions of law and fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case. This action is also properly maintainable under Rule 23(c)(4)(A) for all class issues alleged herein.

378.     The Named Plaintiffs file EEOC charges alleging race/national origin discrimination.

379.     Each Charge put Honda on notice of a potential Class Action.

380.     Each Named Plaintiff received a Notice of Rights Letter from the EEOC.

## FIRST CAUSE OF ACTION
### (Intentional Race/Ethnicity/National Origin Discrimination in Employment)

381.     Plaintiffs incorporate into this paragraph the allegations from each of the preceding paragraphs as if fully rewritten herein.

382.     The Named Plaintiffs are all Hispanic/Latino.

383.     The Named Plaintiffs and the Class are not Caucasian/American born.

384.     At all relevant times, Named Plaintiffs and the Plaintiff Class were employed by Honda.

385.     Honda has adopted and implemented company-wide employment policies.

386.     Honda has implemented an initiative to diversify its workforce, including hiring

Hispanic/Latino candidates who do not speak English or do not speak English fluently.

387. Honda conducts all its business at the East Liberty facility in English only and does not provide regular or consistent interpretation/translation services to Spanish speaking employees.

388. Honda thus knows or should know, that Spanish speakers are ill-equipped to function in the workforce and that the policy/practice of conducting all business in English only is discriminatory to Hispanic/Latino employees.

389. Honda knowingly, intentionally and unlawfully discriminated against each of the named Plaintiffs on the basis of race/ethnicity/national origin.

390. Honda discriminated against the Named Plaintiffs and the Plaintiff Class on the basis of race/ethnicity/national origin by not allowing them to communicate in their native language while working, not providing them with adequate training, subjecting them to safety hazards without proper communication of those hazards, allowing co-workers to harass them and abuse them without repercussion, and otherwise disfavoring them with respect to terms and conditions of employment.

391. Honda has a pattern and practice of discriminating against employees on the basis of race/ethnicity/national origin with respect to training, discipline, termination, wages, transfers, and the provision of other benefits.

392. As a direct and proximate result of Honda's conduct, Plaintiffs and the Plaintiff Class have suffered non-economic and economic injuries, including but not limited to, pain and suffering, the loss of past and future salary and benefits, and other privileges and conditions of employment.

393. Honda's conduct as described herein was reported to Honda, which failed to take prompt, remedial, and appropriate steps to address the unlawful treatment of the Named Plaintiffs and other members of the Plaintiff Class.

394. Honda's conduct violated 42 U.S.C. § 2000e, for which Honda is liable for economic and non-economic compensatory damages, including pain and suffering, and the loss of salary and benefits, and other privileges and conditions of employment in accordance with 42 U.S.C. § 2000e.

395. Honda's conduct violated 42 U.S.C. § 2000e, and was willful, wanton, reckless and/or malicious, and renders Honda liable for economic and noneconomic compensatory damages, punitive damages and costs.

**SECOND CAUSE OF ACTION**
**(Disparate Impact on Basis of Race/Ethnicity/National Origin)**

396. Plaintiffs incorporate into this paragraph the allegations from each of the preceding paragraphs as if fully rewritten herein.

397. Honda has knowingly and intentionally adopted and implemented company- wide English-only employment policies/practices which have a discriminatory disparate and adverse impact on Hispanic/Latino, Spanish-speaking employees.

398. The policy/practice of conducting all business in English without adequate interpretation/translation into Spanish is not, and cannot be, justified on the basis of business necessity. Even if such policies and practices could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

399. As a direct and proximate result of Honda's conduct, Plaintiffs and the Plaintiff Class have suffered non-economic and economic injuries.

400. Honda's conduct violated 42 U.S.C. § 2000e, and was willful, wanton, reckless and/or malicious, and renders Progressive liable for economic and noneconomic compensatory damages, punitive damages and costs in accordance with 42 U.S.C. § 2000e and 42 U.S.C. § 1988.

**THIRD CAUSE OF ACTION**
**(Disability Discrimination in violation of the ADA)**
**Plaintiff Javier Badell Only**

401.    Plaintiff Badell restates and incorporates the foregoing paragraphs as if completely re-written herein.

402.    Defendant Honda is an employer as that term is defined by the ADA.

403.    Badell is a qualified individual with a disability as that term is defined by the ADA.

404.    At all times relevant herein, Badell was able to perform the essential function of his position with or without accommodation.

405.    When Badell requested to be transferred from B-Shift to A-Shift he was seeking accommodation pursuant to the ADA and was engaged in protected activity as that term is defined by the ADA.

406.    Defendant denied Badell's requested accommodation, stating that shift transfers are done by seniority.

407.    Defendant does not have a bona fide seniority system that prevents Defendant from transferring a disabled employee to a different shift as a reasonable accommodation.

408.    Transfer to a different shift is considered a reasonable accommodation.

409.    The only alternative Defendant offered to Badell was to quit his job and apply for work as a temporary with Adecco.

410.    According to Defendant, Adecco employees work for Defendant on A-shift.

411.    Had Badell resigned, there was no guarantee that he would have been hired by Adecco.

412.    Had Badell resigned he would have lost both pay and benefits by quitting his job to apply for work with Adecco on A-shift.

413.    Defendant offered Badell no other alternatives.

414.    Defendant's ADA policy is written in English. Badell speaks and reads in Spanish.

415.    Defendant did not explain the accommodation process to Badell and did not otherwise engage in the interactive process.

416.    Because his disability prevented him from working B-Shift, Badell had no option but to take a leave of absence.

417.    When Badell's leave of absence ended, he had no choice but to resign from his position with Honda because even after filing an internal complaint, his request for accommodation was denied.

418.    Defendant violated the ADA by refusing to accommodate Badell and by failing to engage in the interactive accommodation process.

419.    Badell has been damaged by Defendant's violation of the ADA such that he is entitled to damages therefore.

420.    Defendant acted with willful disregard for Badell's rights under the ADA such that he is entitled to punitive damages and attorney's fees.

## <u>RELIEF REQUESTED</u>

Named Plaintiffs and the Plaintiff Class seek monetary damages sufficient to fully, fairly, and justly compensate them for their injuries and loss. Named Plaintiffs on their own and the Plaintiff Class respectfully request that this Court enter judgment in their favor and enjoin the conduct described herein and to award them past and future economic and non-economic compensatory damages, back pay, front pay, lost benefits, punitive damages, interest, all costs, and any equitable relief that it deems appropriate.

Respectfully submitted,

*/s/ Sharon Cason-Adams*
Sharon Cason-Adams (0067550)
Agee Clymer Mitchell & Portman
140 East Town Street, Suite 1100

Columbus, OH 432157
Phone: (614) 221-3318
Fax: (614) 221-7308
scasonadams@ageeclymer.com
Attorney for Plaintiffs

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues triable before a jury.

*/s/Sharon Cason-Adams*
Sharon Cason-Adams